**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| STEWART ABRAMSON, individually and on behalf of a class of all persons and entitled similarly situated, | Case No. 2:19-cv-01341-MJH |
| | Judge Marilyn J. Horan |
| Plaintiff, | |
| v. | |
| AMERICAN ADVISORS GROUP, et al., | |
| Defendants. | |

**PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND CERTIFICATION OF SETTLEMENT CLASS AND MEMORANDUM IN SUPPORT**

## I.     INTRODUCTION

Plaintiff Stewart Abramson ("Plaintiff") and Defendant American Advisors Group ("AAG" or "Defendant") (Plaintiff and AAG are collectively referred to as the "Parties") have negotiated, and the Court preliminarily approved on May 6, 2020, a class action settlement of this Telephone Consumer Protection Act ("TCPA") case.  (Doc. 69.)  A copy of the Settlement is on file with the Court.  (Doc. 68-1.)  The Settlement requires the establishment of a $3,500,000 Settlement Fund to be distributed pro rata to Settlement Class Members who file a valid claim after payment of notice and administration costs (if approved), Plaintiff's Counsel fees and costs (if approved), and an Incentive Award to the Plaintiff (if approved).[1]  There is no reverter in the Settlement Fund.  Settlement Class Members who do not opt out will each receive a cash payment from this fund of a minimum of $266.70 and a maximum of $1,066.80, depending on how many of their telephone numbers were called by AAG.  (*See* Declaration of Jay Geraci,

---

[1] All capitalized terms not defined herein have the meanings set forth in the Parties' Settlement Agreement ("Settlement" or "Agreement"), filed at Doc. 68-1.

Director for Settlement Administrator, Kurtzman Carson Consultants, LLC ("KCC Decl."), ¶ 21, attached hereto as Exhibit 1.)  This per claim payment amount is well within the range of (and often far exceeds) other TCPA class action settlements approved by courts in this Circuit and elsewhere.

The Parties' Settlement Agreement is now subject to final approval by the Court.  In accordance with the Court's Preliminary Approval Order, a Notice was sent via electronic mail and first class mail to identified Settlement Class Members, advising them of the proposed settlement.  (*See* KCC Decl. ¶¶ 10-15.)  Notably, there were *no objections* to the settlement.  (*Id.* ¶ 20.)

The Settlement Agreement reflects a compromise of the Parties' positions for the purpose of resolving, without further litigation, all issues and claims relating to the allegations made in this Action on behalf of all members of the Class.  As demonstrated below, the Settlement negotiated by the Parties is fair, adequate, and reasonable and provides a substantial benefit to the Settlement Class.

The Parties request that the proposed order attached hereto as Exhibit 2, and filed with the Court previously, be entered.  The order will fully dispose of this matter.

## II.    NATURE AND BACKGROUND OF THE CASE

This case rests on alleged violations of the TCPA, which prohibits, *inter alia*, initiating any telephone solicitation to a phone using an ATDS or an artificial or prerecorded voice.  *See* 47 U.S.C. § 227(b).  The TCPA also makes it unlawful to receive more than one telephone call within any twelve-month period by or on behalf of the same entity after placing your number on the National Do Not Call Registry.  *See* 47 U.S.C. § 227(c)(5).  The TCPA provides a private cause of action to persons who receive such calls.  *Id.*; 47 U.S.C. § 227(b)(3).

A.      THE LITIGATION AND SETTLEMENT NEGOTIATIONS

Plaintiff is a Pennsylvania resident whose telephone numbers have been called with unsolicited messages for years.  On October 18, 2019, Plaintiff filed a putative class action complaint in the United Stated District Court for the Western District of Pennsylvania against Defendant alleging claims for violations of the TCPA.  On March 9, 2020, the Plaintiff filed a First Amended Complaint against the Defendant and Complete Business Marketing Company, LLC DBA Exclusive Prospect.

Since the filing of the original complaint, the Parties engaged in discovery and other litigation relating to class certification and other issues.  During discovery, the Plaintiff took the Defendant's deposition and received thousands of pages of documents relating to the Defendant's policies and procedures for compliance with the TCPA, the dialing system used to make the calls to putative class members, and the relationship between the Defendant and its telemarketing vendor, as well as the targets of the telemarketing campaigns.

The Parties mediated this case with Bruce Friedman from JAMS.  While a settlement was not reached during the initial mediation session, the Parties continued to negotiate during the weeks that followed which eventually culminated in the Settlement Agreement that was submitted to the Court in conjunction with the Motion for Preliminary Approval.  (Doc. 68.)

The Settlement preliminarily approved by the Court establishes a non-reversionary $3,500,000 Settlement Fund, which will exclusively be used to pay: (1) cash settlement awards to Settlement Class Members; (2) Settlement Administration Expenses; (3) court-approved attorneys' fees of up to one-third of the total amount of the Settlement Fund; (4) Plaintiff's out of pocket expenses not to exceed $12,775.25; and (5) a court-approved Incentive Award to the Class Representative of up to $10,000.

Each Settlement Class Member who submits a valid claim shall be entitled to receive an equal *pro rata* amount of the Settlement Fund for each phone number they own after all Settlement Administrative Expenses, Incentive Awards, and fee awards are paid out of the Settlement Fund.

### III.    THE PROPOSED SETTLEMENT

### A.    THE SETTLEMENT CLASS

Pursuant to the Settlement Agreement, Plaintiff is seeking certification of the following Settlement Class for settlement purposes only:

> All persons in the United States who were a regular user or subscriber to numbers assigned to wireless carriers to which a call was made or attempted by American Advisors Group ("AAG"), either directly or by Complete Business Marketing Company, LLC DBA Exclusive Prospect ("EP") for the benefit of AAG, using any automated telephone dialing system or artificial or prerecorded voice message, or a regular user or subscriber to phone numbers that were not assigned to wireless carriers to which a call was made or attempted by AAG either directly or by EP for the benefit of AAG, from January 1, 2017 to May 1, 2020.

(Settlement Agreement ¶ 1.32).  The proposed Settlement encompasses up to approximately 1,361,086 individuals.

### B.    SETTLEMENT RELIEF

### 1.    Class Member Relief:  Settlement Fund

The proposed Settlement establishes a non-reversionary $3,500,000 Settlement Fund, which will exclusively be used to pay: (1) cash settlement awards to Settlement Class Members; (2) Settlement Administration Expenses; (3) attorneys' fees of one-third of the total amount of the Settlement Fund in addition to out of pocket expenses (up to $12,775.25), subject to Court approval; and (4) a Court-approved Service Payment to Plaintiff of up to $10,000.

Each Settlement Class Member who submits a valid claim shall be entitled to receive an equal pro rata amount of the Settlement Fund for each phone number they own on the Class List after all settlement administrative expenses, Service Payment, and fee awards are paid out of the Settlement Fund.  If all the attorneys' fees, expenses, Service Payment, and Settlement Administration Expenses are approved as requested, Class Counsel estimate that the average Settlement Class Member payment will be approximately $266.07 for one phone and up to $1,066.80 for four phones.

**2.      Class Representative Service Payment**

If approved by the Court, the Plaintiff will receive a Service Payment of $10,000 from the Settlement Fund.  As discussed in Plaintiff's previously filed motion for attorneys' fees and incentive award, Doc. 74, this award will compensate Plaintiff for his time and effort and for the risk he undertook in prosecuting this case as well as participating in discovery.  Notably, this motion was posted on the settlement website during the claim and objection period, and no objections were made.

**3.      Attorneys' Fees and Costs**

Class Counsel previously filed a motion for an award of attorneys' fees in the amount of one-third of the total amount of the Settlement Fund ($1,166,665), and out of pocket expenses of $12,775.25.  (Doc. 74.)  The requested award of attorneys' fees and costs will compensate Class Counsel for the work already performed in relation to the settled claims, as well as the remaining work to be performed in documenting the Settlement, securing Court approval of the Settlement, making sure the Settlement is fairly implemented, and obtaining dismissal of the Action.  As required by the Settlement, the motion for attorneys fees was posted on the settlement website so

any Settlement Class Member could review it to make an informed decision about their

participation or objection to the Settlement.

### 4.    Remaining Funds

Any amount remaining in the Settlement Fund after paying all approved Claim Forms,

Settlement Administration Expenses, and any Fee Award and Service Payment will be

distributed to the Court-approved *cy pres* recipient.  The Parties have proposed Electronic

Privacy Information Center ("EPIC") as an appropriate recipient.  (Settlement Agreement ¶ 1.9.)

EPIC is one of the leading consumer privacy organizations in the United States.  EPIC

was established in 1994 to focus public attention on emerging privacy and civil liberties issues

and to protect privacy, freedom of expression, and democratic values in the information age.

(*See* Affidavit of Alan Jay Butler ¶ 3, attached hereto as Exhibit 3.)  EPIC is also one of the

leading organizations in the United States with respect to the enforcement and interpretation of

the TCPA.  Former EPIC staff helped draft the TCPA when it was enacted in 1991.  (*Id.* ¶ 7.)

EPIC has submitted numerous comments to the Federal Communications Commission ("FCC")

concerning the TCPA, including: comments urging the FCC to prevent technical workarounds of

the TCPA and ensure that consumers can easily revoke their consent to be called; comments

recommending protections to shield individuals against junk faxes; comments opposing the use

of auto-dialers for debt collection purposes; and comments arguing against preemption of state

anti-telemarketing laws.  (*Id.* ¶ 8.)

EPIC is both aligned with the interests of class members and advances the aims of the

underlying litigation and would be a worthy *cy pres* recipient.

**C.    NOTICE AND SETTLEMENT ADMINISTRATION**

The Settlement Administrator, Kurtzman Carson Consultants, LLC ("KCC"), caused the notice to be delivered via electronic and first-class mail to Settlement Class Members in accordance with the Settlement Agreement and the Court's Preliminary Approval Order.  (KCC Decl. ¶ 10-15.)  The Settlement Administrator also administered the Settlement Website, processed claim forms, and will issue checks to claimants.  (*Id.*)  The Settlement Administrator's records reflect that approximately 6,999 valid claims covering 7,402 phone numbers have been received, reviewed, and determined to be presumptively valid.  (*Id.* at ¶ 18.)  Subject to this Court's approval, Administration Expenses, which are set forth in great detail in the attached Declaration from the Settlement Administrator, will be paid from the Settlement Fund. (Settlement Agreement ¶ 2.1.5.)

**D.    OPT-OUTS AND OBJECTIONS**

Settlement Class Members were given the opportunity to opt out of or object to approval in accordance with the Settlement Agreement.  (*Id.* ¶ 6.)  In total, only 49 Settlement Class Members opted out, and none objected to any aspect of the Settlement.  (KCC Decl. ¶¶ 19-20).

**E.    RELEASE**

The release is appropriately narrowly tailored to this case involving violations like those alleged and is limited to those Settlement Class Members identified on the Class List, which was compiled of data exchanged in discovery.  In exchange for settlement benefits, the Settlement Class Members who did not timely opt out of the Settlement will release AAG from any and all claims against AAG arising from telemarketing calls that were intended to generate leads for AAG.  (Settlement Agreement ¶¶ 1.26-1.28.)

## IV.    ARGUMENT

### A.    THE SETTLEMENT APPROVAL PROCESS

A court may approve a class action settlement if it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).  "If the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval, then the court should direct that the notice be given to the class members of a formal fairness hearing."  MANUAL FOR COMPLEX LITIGATION (SECOND) § 30.44 (1985).

The amendments to Rule 23(e)(2) that went into effect in December 2018 provide additional guidance, requiring courts consider whether: (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided by the settlement is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal, (ii) the effectiveness of any proposed method of distributing relief including the method of processing class-member claims, if required, (iii) the terms of any proposed award of attorneys' fees, including timing of payment, and (iv) any agreement required to be identified under Rule 23(e)(3) made in connection with the proposed settlement; and (D) the proposal treats class members equitably relative to each other.  Plaintiff will address these factors as applicable, many of which overlap.  There is no governmental participant, and no agreement required to be identified under Rule 23(e)(3).

In addition, the Third Circuit has a strong judicial policy that encourages class settlements, especially those that are the product of arm's length negotiations.  *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 510 (D.N.J. 1997), *aff'd sub nom. Krell v. Prudential  Ins. Co. of Am.*, 148 F.3d 283, 317 (3d Cir. 1998); *see also In re Cmty.*

*Bank of N. Virginia*, 418 F.3d 277, 299 (3d Cir. 2005) ("all Federal Circuits recognize the utility

of … 'settlement classes' as a means to facilitate the settlement of complex nationwide class

actions") (quotation and citation omitted).

**B.     THE CRITERIA FOR FINAL APPROVAL ARE SATISFIED**

The Third Circuit has adopted a nine-factor test to determine whether a settlement is

"fair, reasonable, and adequate" and should be finally approved.  The elements of this test—

known as the "*Girsh* factors"—are:

> (1) the complexity and duration of the litigation; (2) the reaction of
> the class to the settlement; (3) the stage of the proceedings; (4) the
> risks of establishing liability; (5) the risks of establishing damages;
> (6) the risks of maintaining a class action; (7) the ability of the
> defendants to withstand a greater judgment; (8) the range of
> reasonableness of the settlement in light of the best recovery; and
> (9) the range of reasonableness of the settlement in light of all the
> attendant risks of litigation.

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975); *In re GMC Pick-Up Truck Fuel Tank Prods.*

*Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995) (*citing Girsh*, 521 F.2d at 157).

As summarized below, these factors, as well as the factors contained in Rule 23(e)(2),

demonstrate that this Settlement should be finally approved.

**1.     Complexity, Expense, and Likely Duration of the Litigation**

The first *Girsh* factor "captures the probable costs, in both time and money, of continued

litigation."  *In re Cendant Corp. Litig.,* 264 F.3d 201, 233 (3d Cir. 2001) (internal citation and

quotation marks omitted).  "By measuring the costs of continuing on the adversarial path, a court

can gauge the benefit of settling the claim amicably."  *GMC*, 55 F.3d at 812.  This factor

undoubtedly weighs in favor of the Settlement here.  In this litigation, the path from this point to

a final judgment would be long and expensive.  After discovery was completed, the Parties

would have had to brief class certification, and the Court would have been forced to decide the

strongly contested issue of whether a basis exists to certify a class for the purpose of establishing liability.  If the Court determined that certification was warranted, then AAG presumably would have immediately exercised its right to seek interlocutory review of that certification order.  If the certification order was upheld, additional discovery would have been taken (with attendant discovery-related motion practice).  Thereafter, dispositive motions would have been filed by one or both of the Parties, and the Court would have been forced to adjudicate those motions, with additional appellate practice if such dispositive motions resulted in either entry of final judgment or a basis for interlocutory review.  Depending on how the Third Circuit resolved any such appeals, the case might ultimately have gone to trial.  Post-trial motions and additional appeals would have likely followed.

In fact, one of Class Counsel was involved in one of the only TCPA class actions to go through trial, and the amount of work done after class certification and through trial that would have resulted here is indicated in the work done in that case.  *See Krakauer v. Dish Network, L.L.C.*, No. 1:14-CV-333 (M.D.N.C. 2017) (more than 45 motions after a class certification decision through the time of trial).  That case remains on appeal several years after the initial trial was completed.  In short, litigating this Action would have proved lengthy, complex, and expensive, thereby delaying (and potentially dissipating) any benefits that might have been obtainable by Settlement Class Members.  The proposed Settlement permits the Court and the Parties to avoid this significant expenditure of time and resources.  This factor strongly favors preliminary approval of the proposed Settlement.

## 2.    The Reaction of the Class to the Settlement

The second *Girsh* factor "attempts to gauge whether members of the class support the settlement."  *Prudential*, 148 F.3d at 318.  Here, *no Settlement Class Member* has objected to any aspect of the Settlement.  *See In re AT&T Corp. Sec. Litig.,* 455 F.3d 160 (3d Cir. 2006) (district

court did not abuse discretion in finding that second factor weighed strongly in favor of approval where there were eight objections out of one million potential class members); *In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 305 (3d Cir. 2005) (noting that a similarly low level of objection is a "rare phenomenon").  Only 49 members have opted out.  (KCC Decl. ¶ 19.)  The positive response of the Class weighs in favor of approval.

### 3.      The Stage of Proceedings and the Amount of Discovery Completed

The third *Girsh* factor "captures the degree of case development that class counsel [had] accomplished prior to settlement.  Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating."  *See GMC,* 55 F.3d at 813.

This inquiry has two aspects: legal and factual.  *Prudential*, 148 F.3d at 319.  The first aspect is easily satisfied in this case, where the Parties engaged in extensive negotiations and related legal analysis with the help of an experienced mediator with a robust background of dealing with this type of case.  As a result, Class Counsel has a more than adequate appreciation of the legal merits of the case.  The same is true from a factual perspective, which involves "an inquiry into the type and amount of discovery the parties have undertaken."  *Id.*  Here, the Plaintiff took AAG's deposition and received thousands of pages of documents relating to AAG's policies and procedures for compliance with the TCPA, the dialing system used to make the calls to putative class members, and the relationship between AAG and its telemarketing vendor, as well as the targets of the telemarketing campaigns.  Class Counsel has a thorough appreciation of the facts—good and bad—which bear upon the merits of the claims in this litigation.  In view of the foregoing, this factor strongly favors approval of the proposed Settlement.

### 4.      The Risks of Establishing Liability and Damages

As to the fourth *Girsh* factor, as well as factor (C)(i) of Rule 23(3)(2) ("the costs, risks,

and delay of trial and appeal"): "[b]y evaluating the risks of establishing liability, the district

court can examine what the potential rewards (or downside) of litigation might have been had

class counsel elected to litigate the claims rather than settle them." *GMC*, 55 F.3d at 814.  "The

risks surrounding a trial on the merits are always considerable." *Weiss v. Mercedes-Benz of N.*

*Am.*, 899 F. Supp. 1297, 1301 (D.N.J. 1995); *see also, e.g., West Virginia v. Chas. Pfizer & Co.*,

314 F. Supp. 710, 743-44 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971) ("[N]o matter

how confident one may be of the outcome of litigation, such confidence is often misplaced.").

As to the risks of establishing damages: "Like the fourth factor, this inquiry attempts to measure

the expected value of litigating the action rather than settling it at the current time." *Cendant*,

264 F.3d at 238-39 (internal citation and quotation marks omitted).

Plaintiff believes that the claims against AAG would be successful at trial.  Nevertheless,

these claims would face several difficult challenges if the litigation were to continue.  If this

Action proceeds, based on their experience with other TCPA actions and the specifics of this

Action, Class Counsel expects that AAG will aggressively raise multiple issues.

First, when the Settlement Agreement was signed, the constitutionality of the TCPA was

being reviewed by the Supreme Court in *Am. Ass'n of Political Consultants, Inc. v. FCC*, 923

F.3d 159 (4th Cir. 2019) (*Barr v. Am. Ass'n of Political Consultants, Inc.*, No. 19- 631 (petition

for cert filed Nov. 14, 2019)).  While that petition was pending, a number of TCPA cases were

stayed.  *See, e.g., Lindenbaum v. Realgy, LLC*, No. 1:19-cv-2862, Doc. 16 (N.D. Ohio Mar. 19,

2020); *Nelson v. PMC Home & Auto Ins. Agency LLC*, No. 6:19-cv-1387, Doc. 52 (D.S.C. Mar.

10, 2020); *Jones v. USHealth Grp., Inc.,* No. 2:19-cv-2534, Doc. 53 (D. Kan. Mar. 12, 2020);

*Meyers v. Facebook, Inc.,* No. 3:18-cv-0062, Doc. 55 (N.D. Cal. Jan. 24, 2020).  Here, under this uncertainty, the Parties reached their Settlement.

Another one of those risks focuses on the question of whether the dialing system, which Plaintiff contends is a predictive dialer, is an "Automatic Telephone Dialing System" under the TCPA.  As an initial matter, on July 10, 2015, the FCC released an omnibus declaratory ruling clarifying numerous relevant issues affecting the TCPA, including definition of an ATDS under the statute[2]—which was overturned in part in *ACA Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018).  Following the D.C. Circuit's decision in *ACA Int'l,* courts have been split on what constitutes an ATDS under the TCPA.

There is a substantial amount of cases finding predictive dialers are likely not an ATDS.  The Third Circuit Court of Appeals adopted a similar stance in *Dominguez v. Yahoo, Inc.,* 894 F.3d 116 (3d Cir. 2018):

> The decision in ACA International has narrowed the scope of this appeal.  In light of the D.C. Circuit's holding, we interpret the statutory definition of an autodialer as we did prior to the issuance of 2015 Declaratory Ruling.  Dominguez can no longer rely on his argument that the Email SMS Service had the latent or potential capacity to function as autodialer.  The only remaining question, then, is whether Dominguez provided evidence to show that the Email SMS Service had the present capacity to function as [an] autodialer.
>
> ***
>
> Ultimately, Dominguez cannot point to any evidence that creates a genuine dispute of fact as to whether the Email SMS Service had the present capacity to function as an autodialer by generating random or sequential telephone numbers and dialing those numbers.  On the contrary, the record indicates that the Email SMS Service sent messages only to numbers that had been individually and manually inputted into its system by a user.  There can be little

---

[2] *See* https://apps.fcc.gov/edocs_public/attachmatch/FCC-15-72A1.pdf.

> doubt that Dominguez suffered great annoyance as a result of the unwanted text messages. But those messages were sent precisely because the prior owner of Dominguez's telephone number had affirmatively opted to receive them, not because of random number generation. The TCPA's prohibition on autodialers is therefore not the proper means of redress.

*Id.* at 119, 121. In *Glasser v. Hilton Grand Vacations Co., LLC*, 948 F.3d 1301, 1306 (11th Cir. 2020), the Eleventh Circuit weighed in on the definition of an ATDS, holding that only those devices that dial randomly or sequentially generated numbers (without any human intervention whatsoever) constitute an ATDS. Conversely, "predictive dialers," which the Eleventh Circuit defined as devices "that call a list of pre-determined potential customers"—are not an ATDS under the TCPA. *Id.* at 1308–09. This is because predictive dialers do not "randomly or sequentially" dial numbers, but instead dial previously identified numbers from a stored list. *Id.* The Seventh Circuit Court of Appeals adopted a similar position. *See Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 466-69 (7th Cir. 2020). It is undisputed that the dialing system used in this case does not "create" or generate the telephone numbers it dials out of thin air.

Indeed, while this Settlement was pending, another federal court in Pennsylvania held that the same dialing system that was used by AAG was not an ATDS under the TCPA. *See Panzarella v. Navient Sols., LLC*, No. 18-3735, 2020 U.S. Dist. LEXIS 104746, at *12 (E.D. Pa. June 15, 2020) ("[T]here is not a genuine issue of material fact regarding the ability of the ININ dialing system, on its own, as configured by Defendant, to generate random or sequential telephone numbers to be dialed. The Court therefore finds, based on the record presented to it, that the ININ system, as used by Defendant, is not an ATDS.").

The risks associated with this case were highlighted when in July the Supreme Court agreed to hear a case involving a circuit split that exists as to the appropriate definition of an ATDS under the TCPA. *Duguid v. Facebook, Inc.*, No. 17-15320 (9th Cir.), *cert. granted* July 9,

- 14 -

2020.  The outcome of that case could potentially have rendered the claims of the class under the Settlement Agreement completely worthless and certainly would have delayed any resolution of this matter by a year or more had the Parties not come to an agreement prior to the Supreme Court agreeing to weigh in on an issue at the heart of this case.

Class certification is also far from automatic in TCPA cases.  *Compare Tomeo v. CitiGroup, Inc.*, No. 13 C 4046, 2018 U.S. Dist. LEXIS 166117, at *3 (N.D. Ill. Sept. 27, 2018) (denying class certification in TCPA case after nearly five years of hard-fought discovery and litigation), *Jamison v. First Credit Servs.*, 290 F.R.D. 92, 107 (N.D. Ill. 2013) (finding issues of consent to predominate in TCPA action), *and Balschmiter v. TD Auto Fin. LLC*, 303 F.R.D. 508, 527 (E.D. Wis. 2014) (same), *with Saf-T-Gard Int'l v. Vanguard Energy Servs.*, No. 12-3671, 2012 U.S. Dist. LEXIS 174222 (N.D. Ill. Dec. 6, 2012) (certifying a class in a TCPA action and finding no evidence supported the view that issues of consent would be individualized) *and Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 253 (N.D. Ill. 2014) (same).  Even if the class were certified, the Plaintiff would still have a substantial obstacle regarding AAG's vicarious liability for the alleged conduct of the vendors.  The Supreme Court in *Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663 (2016), held traditional agency and vicarious liability principles are required in order to be found liable under the TCPA.

While the Plaintiff was confident that he would ultimately prevail, this Action would continue to be heavily litigated by experienced class action counsel on behalf of AAG.  As with any litigation, there are risks inherent in continuing to litigate, but considering that Plaintiff was able to obtain by settlement much of the relief sought in the litigation, it is in the Class's best interest to accept the relief provided in the Settlement now rather than to spend hundreds of

thousands of dollars in fees and years of time in an attempt to obtain a marginally better result through litigation.

5.      **Risks of Maintaining Class Action Status Through Trial**

Because "the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the class action," *GMC*, 55 F.3d at 817, the court must measure the likelihood of obtaining and maintaining a certified class if the action were to proceed to trial. *Girsh*, 521 F.2d at 157. While for the reasons stated above Plaintiff firmly believes that this case is appropriate for class action treatment, regardless of any settlement, it is undeniable that class certification for settlement purposes removes some of the hurdles upon which some courts have denied certification of a litigation class. For example, manageability is not a concern with settlement classes. *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997).

What is certain is that any decision granting certification absent settlement would be subjected to the cost, delay, and the uncertainty of a Rule 23(f) appellate challenge, before the class could proceed to trial, and an appeal from any verdict or judgment in favor of the class would likewise follow. If a class could not be certified here, it would leave few, if any, class members with both the resources and financial incentive to chase a maximum $500 award for each statutory violation on their own, with the practical result of no recovery by anyone. *See Carnegie v. Household Int'l, Inc.,* 376 F.3d 656, 661 (7th Cir. 2004) ("The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.") (emphasis in original). The proposed Settlement provides a remedy now to all Settlement Class Members, rather than risking an uncertain result after years of expensive litigation.

6.        **Ability to Withstand a Greater Judgment**

The sixth *Girsh* factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the [s]ettlement." *Cendant*, 264 F.3d at 240.  This factor is particularly relevant here.

In a TCPA case such as this, the potential damages could bankrupt AAG.  Unlike a large public company with extensive financial resources, AAG is a regional, privately-held company.  As one court acknowledged in approving a TCPA settlement:

> Individual class members receive less than the maximum value of their TCPA claims, but they receive a payout without having suffered anything beyond a few unwanted calls or texts, they receive it (reasonably) quickly, and they receive it without the time, expense, and uncertainty of litigation....  *[C]omplete victory for Plaintiffs at $500 or $1,500 per class member could bankrupt [the defendant]....  [The] recovery in the hand is better than a $500 or $1,500 recovery that must be chased through the bankruptcy courts.*

*Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 228 (N.D. Ill. 2016) (emphasis added); *see also Reinhart v. Lucent Tech.*, 327 F. Supp. 2d 426, 438 (D.N.J. 2004) ("[T]he risk of nonpayment is 'acute' where a defendant lacks 'significant unencumbered hard assets against which plaintiffs could levy had a judgment been obtained.'") (quoting *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 150 (E.D. Pa. 2000)).

The typical risks of nonpayment are accentuated in the current economic client where the country is facing the COVID-19 pandemic and the accompanying financial stress that is affecting nearly every business and individual in some form or fashion.  The uncertainty created by this environment makes the certainty created the Settlement achieved by Plaintiff's Counsel even more valuable and prudent for the Class.  This factor weighs heavily in favor of approval.

7.      **The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation**

The last two *Girsh* factors are usually considered together.  They ask "whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial."  *Prudential*, 148 F.3d at 322.  As Judge Becker explained in *GMC*, "[t]he evaluating court must ... guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution."  55 F.3d at 806.  These factors overlap with Rule 23(e)(2)(C) (relief provided by the settlement is adequate, taking into account risks, distribution method, and attorneys' fees).

As explained above, the Settlement amount here is reasonable relative to the claims asserted and the risks inherent in bringing those claims to a successful judgment after trial.  The Settlement amount and minimum per claimant payment of approximately $266.70 is well above other TCPA settlements approved across the country.  The following provides a summary overview of a sampling of per claimant recoveries in similar TCPA cases around the country that establishes the result achieved in this case is not just reasonable but exemplary when compared to outcomes negotiated in other class settlements:

| Case Name | Claimant Amount |
|---|---|
| *Schely v. Verde Energy USA, Inc.,* No. 2:17-cv-00887-WB (E.D. Pa. May 19, 2020) | $100.00 cash |
| *Amanda Hopkins v. Modernize Inc.,* No. 4:17-cv-40087-TSH (D. Ma. Oct. 9, 2019) | $26.00 cash |
| *Marengo v. Miami Resch. Assocs., LLC,* No. 1:17-cv-20459-KMW (S.D. Fla. July 20, 2018) | $130.00 cash |
| *Vasco v. Power Home Remodeling Group LLC,* No. 15-cv-4623, 2016 U.S. Dist. LEXIS 141044 (E.D. Pa. Oct. 12, 2016) | $27.00 cash |
| *Kolinek v. Walgreen Co.,* No. 13-cv-4806, 2015 WL 7450759, at *7 (N.D. Ill. Nov. 23, 2015) | $30.00 cash |
| *In re Capital One TCPA Litig.,* 80 F. Supp. 3d 781, 789 (N.D. Ill. 2015) | $39.66 cash |

| Case Name | Claimant Amount |
|-----------|-----------------|
| *Rose v. Bank of Am. Corp.*, No. 11-cv-02390- EJD, 2014 U.S. Dist. LEXIS 121641, at *30 (N.D. Cal. Aug. 29, 2014) | $40.00 cash |
| *Steinfeld v. Discover Fin. Servs.*, No. C 12-01118, 2014 WL 1309352, at *6 (N.D. Cal. Mar. 10, 2014) | $46.98 cash |
| *Markos v. Wells Fargo Bank, N.A.*, No. 1:15-cv-01156-LMM, 2017 WL 416425, at *4 (N.D. Ga. Jan. 30, 2017) | $24.00 cash |
| *Manoucherhi v. Styles for Less, Inc.*, Case No. 14cv2521 NLS, 2016 WL 3387473, at *2, 5 (S.D. Cal. June 20, 2016) | $10.00 cash (or $15.00 voucher) |
| *In re Jiffy Lube Int'l, Inc. Text Spam Litig.*, No. 3:11-md-02261 (S.D. Cal. Feb. 20, 2013) | $12.97 cash (or $17.29 voucher) |
| *Estrada v. iYogi, Inc.*, No. 2:13-01989 WBS CKD, 2015 WL 5895942, at *7 (E.D. Cal. Oct. 6, 2015) | $40.00 cash |
| *Cubbage v. Talbots, Inc.*, No. 09-cv-00911-BHS (W.D. Wash. Nov. 5, 2012) | $40.00 cash (or $80.00 voucher) |
| *Wijesinha v. Susan B. Anthony List, Inc.*, No. 1:18-cv-22880-JEM (S.D. Fla. 2019) | $5.00 cash |
| *Satterfield v. Simon & Schuster, Inc., et al.*, No. 06-cv-2893 (N.D. Cal. 2010) | $175.00 cash |
| *Goldschmidt v. Rack Room Shoes, Inc.*, No. 1:18-cv-21220-KMW (S.D. Fla. 2019) | $5.00 cash (and $10.00 voucher) |
| *Poirier v. CubaMaxTravel, Inc.*, No. 1:18-cv-23240-CMA (S.D. Fla. 2018) | $7.00 cash |
| *Weinstein v. The Timberland Co.*, No. 06-cv-00484 (N.D. Ill. 2008) | $150 cash |
| *Mohamed v. Off Lease Only, Inc.*, No. 1:15-cv-23352-MGC (S.D. Fla. 2019) | $50.00 cash |

And the proposed method of distributing relief and processing claims is effective and equitable. Fed. R. Civ. P. 23(e)(2)(C). To participate in the Settlement, Settlement Class Members were only required to submit simple claim forms. They can participate in the benefits of the Settlement regardless of whether that Settlement Class Member retained calling records or any other proof related to receipt of calls that violated the TCPA. Payments to claimants will be sent after final approval, and all claimants will receive an equal amount. *See* Fed. R. Civ. P. 23(e)(2)(D) ("the proposal treats class members equitably relative to each other").

The terms of the proposed attorneys' fees were disclosed in the Class Notice and are well in line with fees in other cases. Attorneys' fees awarded will be paid at the same time Settlement Class Members are paid.

8.      **The Class Representative and Class Counsel Have Adequately Represented the Class**

Rule 23(e)(2)(A) requires the Court to consider whether the Class Representative and Class Counsel have adequately represented the Class.  For the reasons stated in the Plaintiff's memorandum in support of preliminary approval, Doc. 68 at pp. 11-12, this requirement is satisfied.  Plaintiff's interests are aligned with those of the Class, and he has served the Class's interests in this litigation and in obtaining this Settlement.  And Class Counsel are experienced TCPA litigators.  (Class Counsel Decl., Doc. 68-2.)

9.      **The Proposal Was Negotiated At Arm's Length**

Rule 23(e)(2)(B) instructs the Court to consider whether the proposed settlement was negotiated at arm's length.

Here, the Parties reached the Settlement through formal mediation sessions with a highly respected, independent mediator, Bruce Friedman of JAMS.  Prior to their sessions, the Parties prepared memoranda and exchanged information relevant to settlement negotiations.  The negotiations were substantive and included extensive discussions about the merits of Plaintiffs' legal claims and AAG's defenses.

The negotiations continued for weeks after being able to reach a resolution during the initial mediation session with Mr. Friedman.  The prolonged, hard-fought, and arm's length negotiations between experienced attorneys for both sides and the result for the Settlement Class are all testaments to the non-collusive nature of the settlement.  And "the participation of an independent mediator in settlement negotiations virtually insures that the negotiations were conducted at arm's length and without collusion between the parties." *In re ViroPharma Inc. Secs. Litig.*, No. 12-cv-2714, 2016 U.S. Dist. LEXIS 8626, at *24 (E.D. Pa. Jan. 25, 2016) (citation omitted).

The "arm's-length negotiation" factor of Rule 23(e)(2)(B) weighs in favor of preliminary approval.

## C.  CLASS MEMBERS WERE SENT PROPER NOTICE

The threshold requirement concerning class notice is whether the means employed to distribute the notice was reasonably calculated to apprise the class of the pendency of the action, of the proposed settlement, and of the class members' right to opt out or object. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 159, 173 (1974); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950).  The notice process that was successfully implemented in this case more than satisfied all requirements.  As previously approved by the Court, the Parties implemented a Notice Plan including Email Notice, Postcard Notice, Press Release Notice, and publication of a Long-Form Notice on the Settlement Website.  The language of the Email Notice, Postcard Notice, Press Release Notice, and Long-Form Notice was negotiated and agreed to by the Parties and approved by the Court prior to being disseminated.  The proposed notices were written in simple terminology and included: (1) a description of the Class; (2) a description of the claims asserted in the class actions; (3) a description of the Settlement; (4) the deadlines for filing a Claim Form and/or for exercising the right to opt out (including limitation on the opt-out right); (5) the names of counsel for the Class; (6) the fairness hearing date; (7) an explanation of eligibility for appearing at the fairness hearing; and (9) the deadline for filing objections to the Settlement.  (KCC Decl. Exs. C-H.)

The Settlement Administrator utilized a set of reliable and robust databases to initially compile email addresses to provide Email Notice to as many Settlement Class Members as possible.  (KCC Decl. ¶ 7.)  They then supplemented with Postcard Notice to those Settlement Class Members for whom email addresses either could not initially be located or for whom the

initial Email Notice resulted in a bounce back message indicating that it had not been delivered. (*Id*. ¶¶ 11-12.)

Rule 23(e)(1) requires the court to "direct notice in a reasonable manner to all class members who would be bound by" a proposed settlement.  Fed. R. Civ. P. 23(e)(1); *see also* MANUAL FOR COMPLEX LITIGATION, *supra*, at § 21.312.  The best practicable notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Lightspeed Media Corp. v. Smith*, 761 F.3d 699, 704 (7th Cir. 2014), citing *United States Air Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010).

The Notice that was previously preliminarily approved by this Court and disseminated to the Settlement Class satisfies these criteria.  The Notice is clear, straightforward, and provides persons in the Settlement Class with enough information to evaluate whether to participate in the Settlement.  The Notice Plan constituted the best notice practicable under the circumstances, provided due and sufficient notice to the Settlement Class, and fully satisfied the requirements of due process and Federal Rule of Civil Procedure 23.

## D.    CERTIFICATION OF THE SETTLEMENT CLASS IS APPROPRIATE

The Settlement Class meets all of the requirements for certification under Rule 23.  There are no significant factual or legal differences among Class Members—all were subject to illegal telemarketing, and all are subject to the protections of the TCPA.  For the reasons set forth more fully in the motion for preliminary approval, Doc. 68, which have not changed, all of the Rule's requirements are met in the Settlement Class.  Plaintiff therefore requests that the Court finally certify the Settlement Class for settlement purposes.

## V.      CONCLUSION

The proposed class action Settlement is fair, reasonable, adequate, and well within the

permissible range of possible judicial approval.  It should, therefore, be approved in all respects.


Respectfully submitted,

**/s/ Brian K. Murphy**
Brian K. Murphy (admitted *pro hac vice*)
Joseph F. Murray (admitted *pro hac vice*)
Murray Murphy Moul + Basil LLP
1114 Dublin Road
Columbus, OH 43215
Telephone: 614.488.0400
Facsimile: 614.488.0401
E-mail: murphy@mmmb.com
           murray@mmmb.com

Anthony I. Paronich
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(508) 221-1510
anthony@paronichlaw.com

*Attorneys for Plaintiff and the Proposed Class*


## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2020, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification to all counsel of

record.

**/s/ Brian K. Murphy**
Brian K. Murphy